MEMORANDUM OF DECISION
This is an action for the termination of parental rights of Patricia W. and David W. the married biological parents of David W. The petition was initiated by the Department of Children and Families (DCF) on November 3, 1995.
The judicially approved form for petition to terminate parental rights allows the petitioning individual or agency to check applicable boxes regarding grounds for termination. The petitioner checked applicable and nonapplicable boxes alike. Accordingly, every possible ground for a contested termination of parental rights was alleged even though half of the grounds alleged were inappropriate
The petition alleges that (1) the parents have abandoned the child; (2) the child has been found in a prior proceeding to have been neglected and the parents have failed to rehabilitate themselves; (3) there is no ongoing parent-child relationship between the parents and the child as that concept is defined by General Statute § 17a-112 (c)(3)(D) and (4) the child has been CT Page 9495 denied by reason of act or acts of commission or omission by the parents, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. The petition further alleges that these grounds have existed for more than one year prior to the filing of the petition.
On the third day of this six day trial, the court, on motion by the respondents, dismissed the grounds of abandonment and no on-going relationship with the child, since there was ample evidence presented to establish that the parents had a limited on-going relationship with the child and that they had not abandoned the child since they visited regularly and attempted to display affection to the child. "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re JuvenileAppeal (Docket No. 9489), 183 Conn. 11, 14, 438 A.2d 801 (1981). No evidence had been offered by the petitioner which supported either of those grounds.
FINDINGS OF FACT
Various exhibits were admitted into evidence, including x-rays, hospital records, psychological reports and social studies; twenty-five witnesses testified.[2] Based upon the evidence and testimony produced at trial and the review of the record, the court makes the following findings.
(1) On July 12, 1993, David was born to the respondents. The child was two months premature, weighed three pounds nine ounces and, as a consequence, remained in the hospital until he was discharged eighteen days later on August 1, 1993.
(2) David lived with his biological parents from August 1, 1993 until September 5, 1993, a period of thirty-six days, at which time the child entered the Yale New Haven Hospital with multiple, life threatening injuries. The injuries consisted of four fractures of the left ribs at 5, 6, 7 and 8; a fracture showing interval healing on the right femur; a spiral fracture of the left femur; a distal left femoral fracture which appeared healed; two recent fractures of the right tibia and fibula; a collapsed lung; multiple bruises and petechiae on the face, neck and chest, which Dr. John Levanthal, Professor of Pediatrics at the Yale University School of Medicine, testified was likely caused by the child screaming in pain. CT Page 9496
(3) The biological parents had exclusive control and custody of the child during the days immediately preceding the child's injuries and offered no adequate and plausible explanation for the injuries. They posited that the x-ray technician at Yale-New Haven Hospital may have handled the child too roughly.
(4) Upon discharge from the hospital on September 8, 1993, the Department of Children and Families (DCF) took custody of the child, placed the child in foster care, and thereafter sought and obtained an Order of Temporary Custody. Following a study by the DCF foster care unit, the mother's brother Robert and his wife, a childless couple, were found to be cooperative, committed and agreeable to caring for this infant child. On Christmas Eve, 1993, the child was placed with these relatives and the child has been well cared for in that home since then. The child loves his foster parents as he would a natural parent and the foster parents love David. They would readily adopt the child if the parents' rights to the child were terminated.
(5) The child's biological mother, Patricia W., was born and raised in Connecticut. She has a high school education plus some community college experience. She moved to Florida when she was thirty-one years of age and worked in a shoe store in a mall. There she met David, her future husband. He was fifteen years of age at the time and worked in a restaurant in the same mall. They were married on July 4, 1992. The initial DCF social workers investigating this case found many discrepancies in Patricia's claims and statements. She maintained she was a psychiatric nurse, which she is not. She maintained that she and her husband had previously been psychiatrically evaluated at Yale-New Haven Hospital "all week long and had passed with flying colors." The social worker could find no record of any such evaluation. Her brother described Patricia as an habitual liar.
(6) The child's male biological parent, David W., was adopted at age 6. He does not know his ethnic origin. He recalls living in different foster homes until he was adopted. He did not get along with his adoptive parents; he was a discipline problem for them. He reports being "kicked out" when he was eighteen. He began drinking and smoking at age eight. He reports a history of drug use, but maintains he just quit. He "lied his way through" a substance abuse program that was like "being in jail." He reports to having been in special education classes and was frequently in fights at school because "my big mouth got me in trouble." He was CT Page 9497 homeless just before his marriage to Patricia. The two moved to Connecticut from Florida in April, 1993 after a hurricane made them unable to find employment. Patricia was pregnant when they moved. David was nineteen, Patricia was thirty-six.
(7) Dr. David Mantell testified that he was asked to do psychological assessment in connection with a seriously, multiply injured infant to determine where it would it be safe for this child to live. He was also asked to determine who, if any, may possess psychological profiles that may be unsafe to this child. Dr. Mantell concluded that the aunt and uncle could reliably provide for the child's care and safety and that the biological parents could not. He recommended a course of treatment for the parents. His various reports began in November, 1993 and continued up until February, 1996 when he was asked to do a home study.
Dr. Mantell indicated that before the child could be safely returned to the parents it would be imperative to 1) identify the perpetrator, 2) identify the mechanism of the injury, 3) identify the social context of the injury, 4) determine the motivation for the injury and 5) insure the co-parent or non-perpetrating parent understood the consequences of the injuries and their role in protecting the child. It would be essential to identify whether the non-perpetrating parent exists, or whether and to what extent the co-parent was culpable in observing or acquiescing and why the parent railed to protect the child in a parentally responsible way. Dr. Mantell indicated that before therapy could be helpful, there would need to be an active acknowledgment of the abuse by the perpetrator. A passive acknowledgment that there was sufficient contextual information to make a finding of guilt or responsibility would not be sufficient. An actual acknowledgment and acceptance of responsibility was required, as well as a clear admission of culpability; a clear definition of the mechanism of the injury would also need to be delineated.
Dr. Mantell described a profile of a child abuser as an adult with 1) a dual diagnosis, i.e. substance abuse and psychological problems, 2) significant history of personal abusive treatment; and 3) a dysfunctional relationship with the co-parent.
Treatment for such an individual would have to focus on all three problem areas. Dr. Mantell indicated that it would be intolerably risky to return the child to these parents at this time since the father, David W., had a personal and psychological CT Page 9498 profile consistent with that of a child abuser.
(8) Two years after the injuries occurred, October 18, 1995, the father went to the local police department and made a written statement as follows:
 Regarding the incidents surrounding my son, David's injuries. I feel that I may have been responsible for inflicting those injuries. I suffer from a memory loss for which I am presently being treated. (Petitioner's Exhibit 8A)
Dr. Mantell described this statement to the police as ". . .nothing more than a gesture, it doesn't mean much. It may have been an act of desperation." It was certainly not the active acknowledgment and acceptance of personal responsibility necessary for therapeutic resolution.
Dr. Owen Schneider, a board certified psychiatrist who treated the father, was called by the father to testify. He indicated that David W. Sr. was referred to him by Margaret Anderson, David W.'s counselor, for severe depression. Dr. Schneider found David to have very severe depression; irritability was seen as a major symptom with problems of anger management. Suicidal thoughts by David were of continuing clinical concern to him. David's symptoms included loss of interest in pleasure in life, suicidal ideation, agitation, fatigue, loss of sleep, biological alteration in brain functioning, a vulnerability as to his genetic origin, and a feeling of being out of control. Two precipitating environmental factors included losing his son who was in DCF custody, and working in a metal plating plant which may have produced higher lead serum levels. This latter problem may cause mood disorders, cognitive problems, memory problems and motor problems. Dr. Schneider was asked if David had memory problems to which he replied ". . . after agitated moods he might have poor recollection of events." After reviewing Exhibit 8A regarding the statement David gave to the police that he may have caused injury to his child but may not remember it, Dr. Schneider testified, "There may be partial amnesia for the height of the anger attack."
Dr. Schneider prescribed lithium for mood stabilization and anger control. Seven changes in medication were made for David including anti-psychotic and anti-anxiety medications such as, CT Page 9499 Zoloft, Prozac, Wellbutrin, Dexitrim, and Respiradol (a major tranquilizer).
(9) Dr. Mantel analyzed Patricia and David as a couple as follows "an unusual couple" with the wife being substantially older and the psychologically stronger, dominate member of the pair (See Petitioner's Exhibit #11A, p. 8.) The husband was younger, immature, with family of origin difficulties, distressed emotions, severe conduct disorder, substance abuse, history of impulsivity and acting out behaviors which included violence, educational limitations (learning disabled, special education classes), history of loss and loneliness, lack of intimacy in childhood and adolescence with consequent anger and pain, personality disorder, and significant psychological distress. The couple reported to Dr. Mantell that their marriage was sound with no problems and they had no treatment needs. The husband and wife maintained that there was nothing going on in their relationship that would suggest these kinds of problems. They reported no presence of personal violence in their relationship.
(10) The principal defense to the termination of parental rights case by the respondents revolves around the testimony of Margaret Anderson of Derby, Connecticut. Ms. Anderson described her credentials as a bachelors degree in psychology and sociology, a master of arts degree in counseling, a master of arts degree in marriage and family therapy. She testified that she a licensed marriage and family therapist, a certified alcohol and drug therapist, a soon to be licensed sex therapist, and a licensed Gestalt therapist.
In August of 1994, Patricia called Ms. Anderson's office and arranged for counseling, initially once a week, for a total of seventy-eight visits since 1994. Ms. Anderson described the difference between counseling and therapy as ". . . in counseling, we can tell them what we think they should know or do. In therapy, the therapist wants the person to come to self acknowledgment". She said that the couple was distressed, concerned and suspicious, and they wanted help. She noted David had a flat affect, a criteria often tied to depression. David had a high level of anger, a Mohawk style hair-do, and his rage, which was very up front, was not directed at her. She noted that David had a serious substance abuse history in Florida including inpatient psychiatric hospitalization. "Anger management was the first thing; DCF wanted it addressed. They wanted it addressed and it was a symptom of David that was causing him a great deal CT Page 9500 of distress. On a scale of one to ten, he said his anger was thirteen."
Ms. Anderson has seen the couple in counseling as recently as April, 1997. She stated that they have matured through their counseling. According to Ms. Anderson, David has entered adulthood, and has learned to take responsibility for himself. Husband and wife have learned to work as a couple. Ms. Anderson said that she couldn't guarantee the safety of the child if he were to be returned. "I believe that both realize and accept that something awful happened" and that ". . . David has acknowledged as completely as he can."
(11) Dr. Bruce Freedman also testified as a witness for the respondents. He filed a written report (Respondent's Exhibit A, dated 4-15-96) in which he indicated that from his contacts with Ms. Anderson, he learned that Patricia had a heart attack three weeks earlier, that David was able to take care of her "without any outbursts" and that as a consequence of their health concerns they had both cut back from being heavy smokers (three packs a day) to only three to six cigarettes a day. She told Dr. Freedman that David, who is now twenty-two, is still immature, but capable of change. Both parents had low IQ scores. Nonetheless, Ms. Anderson told Dr. Freedman that she believed reunification was advised, that it should occur over time and that it would have to be done carefully and cautiously.
The court has reviewed carefully the written report from Dr Freedman together with his testimony. Dr. Freedman very candidly admitted in response to questioning by counsel and by the court that while Patricia has borderline intelligence, she has no memory loss. She is capable of covering up "if David did something wrong" and has sufficient intellectual capacity to understand that if she admitted to failing to protect her son, she might loose custody of him and might go to jail. Dr. Freedman testified that David had equal intellectual capacity and that his knowledge of the consequences of his actions might act as a powerful incentive for him to not remember what happened. Dr. Freedman recognized the special difficulties in cases where no parent acknowledges the abuse. He also recognized that "in order to protect the safety and health of the child, reasonable views of the mechanism or perpetrator of the injury must be developed, and remedial services arranged. Dr. Freedman believed, however, that the strong endorsement of the service provider, Ms. Anderson, should provide the "acceptable margin of safety." This CT Page 9501 court disagrees.
The court acknowledges impressive rehabilitation by the parents that has tremendously improved their personal and marital prospects. The court further acknowledges that the parents care for the child and have regularly exercised most visitation permitted by DCF. The court finds that the couple has made "excellent progress in all areas" but one, acknowledgment and acceptance of personal responsibility for causing multiple, serious life threatening injuries to their own infant child. This deficiency goes to the very issue of safety and well-being of the child. This is not an issue that can be carefully skirted in therapy. The court accepts and adopts the observations of Dr. Mantell in this regard.
ADJUDICATION
(1) "The child has been abandoned by the mother/father in the sense that the parent(s) failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." This ground was dismissed during the trial.
(2) "There is no ongoing parent-child relationship with respect to the mother/father which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child."
It was a cruel hoax[3] to make such an allegation. This ground for termination was dismissed.
(3) "The child has been found in a prior proceeding to have been neglected or uncared for. The mother/father has/have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, he/she/they could assume a responsible position in the life of the child."
The court finds by clear and convincing evidence that the court has previously adjudicated the child neglected[4]
(Barnett, J. 1/11/94). The court further finds that the parents have made a degree of personal and marital rehabilitation which is personally beneficial and encouraging to them individually and CT Page 9502 collectively. The court finds, however, that this rehabilitation has not been sufficient to encourage the belief that within a reasonable time considering the age and needs of the child, they could resume a responsible parental role, that is keeping the child safe and free from life-threatening injury. In Re ChristinaV., 38 Conn. App. 214, 660 A.2d 863 (1995). Both Dr. Mantell and Dr. Freedman believe the parents need continued therapy. Neither parent has acknowledged meaningful personal responsibility for the life threatening injuries to the infant. The child has waited for closure long enough. The court finds that the parents have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, they could assume a responsible position to insure the safety of the child.
(4) "The child has been denied, by reason of an act or acts of parental commission or omission by the mother/father the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights."
This ground is the most applicable of the four grounds alleged. Here the child has been clearly exposed to nonaccidental or inadequately explained serious physical injury. The father has obliquely suggested that he possibly did something harmful. The mother has, at a minimum, failed to protect the child. After nearly four years, the parents are only marginally able to deal with their responsibility for, if not participation in those injuries. The court finds that this ground has been proven by clear and convincing evidence.
The court finds that these two grounds have existed for more than one year.
MANDATORY FINDINGS
Having determined that grounds for terminating the parental rights exist, the court must then consider the seven factors set forth in § 17a-112 (e) as amended.
(1) The timeliness, nature and extent of services offered or provided the parents and the children by an agency to facilitate reunion. The court finds that services have been offered and CT Page 9503 provided, to some avail, in this case. Visitation services were provided, many parent services were offered, counseling services and psychological evaluations were conducted.
(2) Whether the agency has made reasonable efforts to reunite the family pursuant to the requirements of the federal Child Welfare Act of 1980 as amended. The court notes that the agency (DCF) has offered and provided services as above and as set forth more specifically in the Social Study (Petitioner's Exhibit to # 7).
(3) With respect to court orders, service agreements and expectations the parties entered into court expectations (Exhibit # 5). The parents have substantially complied with the expectations. They have not had extended individual therapy and have failed to directly address the issue of personal responsibility in a meaningful way.
(4) The feelings and emotional ties of the children with respect to the parents and other caretakers. The child has ambivalent feelings about his multiple relationships. He feels safe, secure and is doing well in his present foster care. The Social Study, paragraph 17, outlines the difficulties in visitation. The court finds the visitation to be seriously undermining the child's sense of permanency and stability. Since the child has not been in the parent's care in nearly four years, it would be unrealistic to expect a parental bond to exist.
(5) The court has considered the age of the child, nearly four, and the great length of time in the child's life that he has been in foster care three and a half years. Permanency planning is essential.
(6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interest of the children to return him home in the foreseeable future, etc. The parents have made great efforts to adjust their circumstances through counseling. Regrettably, they have yet to fully acknowledge and deal with their role in the child's physical abuse. While the parents' means were limited, they persevered to participate in therapy and to purchase much needed medications. They recognize on some level that they have participated in great and tragic injury to their child. Neither fully and openly acknowledges this. Neither has therefore been able to deal with this in therapy. CT Page 9504
(7) Finding regarding the prevention of a parent from having a meaningful relationship etc. The whole placement process in foster care undermines the parental relationship. Time away from the parent acted as yet another barrier to maintaining the parent child relationship. All of these events were done to keep the child safe. At the same time they operated against maintaining a meaningful relationship. The parents attended most visitation sessions and were able to maintain a visiting relationship with the child.
DISPOSITION
"Our statutes and case law make it crystal clear that the determination of the child's best interests comes into play only after statutory grounds for termination of parental rights have been established by clear and convincing evidence." In re ValerieD., 223 Conn. 492, 511, 613 A.2d 478 (1992). Here the court has found that grounds exist to terminate the parents' rights to the child. The court has also considered the mandatory findings and concludes from the totality of circumstances that termination of parental rights is in the child's best interest. This finding is made after considering the child's sense of time, his need for a secure, safe and permanent environment, the relationship the child has with the foster parents and the totality of circumstances. In Re: Juvenile Appeal, (anonymous) 177 Conn. 648,667-668, 420 A.2d 875 (1979). See generally, J. GOLDSTEIN, A. FREUD AND A. SOLNIT, BEYOND THE BEST INTERESTS OF THE CHILD 99 (1979).
ORDER
The court, having considered all statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights and, upon all of the facts and circumstances presented, it is in the child's best interest to terminate the parental rights of Patricia W and David W. for the reasons previously expressed. Accordingly, it is ordered that their parental rights in and to the minor child, David W. are hereby terminated. It is further ordered that the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for the purpose of securing an adoptive family or other permanent placement for said child and that the Commissioner shall file with the Superior Court for Juvenile Matters no later than ninety days following the date of judgment CT Page 9505 a written report toward such permanent placement, and file such further reports as are required by state and federal law.
FOLEY, J.